**Roberta E. ANDERSON, et al., Plaintiffs–Appellants,**

**Communications Workers of America, Plaintiff–Appellee,**

v.

**AT&T CORPORATION, Defendant–Appellee.**

No. 96–4397.

United States Court of Appeals, Sixth Circuit.

Argued March 19, 1998.

Decided June 2, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied July 10, 1998.

ARGUED: Richard E. Lord, Reynoldsburg, OH, for Appellants. James D. Cutlip, AT&T Corp., Morristown, NJ, for Appellees. ON BRIEF: Richard E. Lord, Reynoldsburg, OH, for Appellants. James D. Cutlip, AT&T Corp., Morristown, NJ, Stuart M. Gordon, Porter, Wright, Morris & Arthur, Columbus, OH, for Appellees.

Before: BOGGS, NORRIS, and MOORE, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

In this case, 58 employees of defendant AT&T Corporation ("AT&T"), each of whom works at an AT&T manufacturing plant in Columbus, Ohio, and is represented for collective-bargaining purposes by the International Brotherhood of Electrical Workers Local 2020 ("IBEW"), sued AT&T to recover benefits they allege were conferred on them by a collective-bargaining agreement negoti-

ated while they worked at various other AT&T facilities and were represented by a different union, the Communications Workers of America ("CWA"). The district court dismissed the case on AT&T's summary-judgment motion, holding as a matter of federal labor law that benefits conferred upon workers when they are part of a collective-bargaining unit represented by one union cannot follow those workers when they transfer within the same company to a new collective-bargaining unit represented by a different union. Because we find no basis in federal labor law for treating such workers differently from retirees or other workers who have left the original bargaining unit, but who clearly are entitled to continued receipt of previously vested benefits, we now reverse.

## I

The plaintiffs in this case contend that they are entitled to certain supplemental wage and pension payments under a collective bargaining agreement negotiated by CWA, their former collective-bargaining representative, while they were employed at AT&T plants in Arizona, North Carolina, and Missouri.[1] As with any contract dispute, the central question presented is the intent of the contracting parties: here, whether the parties intended these wage and pension supplements to be "portable." We therefore begin by examining the background of the agreement under which the disputed wage and pension supplements were to be paid.

Beginning in the 1940s, certain hourly production workers at AT&T's manufacturing facilities received "special supplementary wage treatments" ("SSWTs"). SSWTs were designed to compensate workers based on performance, as measured by quantities of finished product produced by a defined group of employees. In 1986, these SSWTs were replaced by a new system of incentives called special hourly payments ("SHPs"), which were calculated based on seniority rather than on productivity. In the AT&T vernacu-

lar, both SSWTs and SHPs are referred to as "plugs" or "wage supplements."

In 1986, when all the plaintiffs in this case were represented by the CWA, AT&T conducted collective-bargaining negotiations with the national organizations of both the CWA and the IBEW. AT&T proposed two major changes to the then-existing collective bargaining agreements: first, AT&T proposed to consolidate multiple pay-grade levels into only two or three such levels; and second, AT&T proposed to eliminate wage incentives, including SSWTs. The CWA initially resisted the proposal to eliminate wage incentives. Later, the CWA agreed in principle to a system under which production workers who had been receiving wage incentives would receive a substitute consisting of an additional payment added to the negotiated base wage, an additional increase in the base wage itself, and an adjustment to the pension system. Because the parties were unable to agree on whether this new payment structure would apply to workers who were not already receiving the existing wage incentives, however, the CWA went on a 29-day strike.

During the strike, Robert E. Allen, AT&T's newly elected president, sent a letter to all AT&T production employees represented by the CWA (including the plaintiffs), copies of which were reproduced in newspaper advertisements in areas where AT&T plants were located. Allen's letter purported to describe the substantive provisions of AT&T's offer to the CWA. In his letter, Allen stated:

> We also plan to replace wage incentives in all of our factories. The incentive payments will be replaced with additional increases of 2% or 3% in the base wage, depending on location. That increase is in addition to the 8% increase called for in our offer. In addition, wage-incentive employees will receive special monthly payments based on their wage incentive earning history. *These payments will be made to employees for as long as they are employed by the company.* Special pension

---

1. The plants in question were the Kansas City Works, the North Carolina Works, and the Phoenix Works.

adders ranging from 16% to 24% of current pension band values depending on locations, will be applicable to all wage-incentive employees.

(Emphasis added). In an apparent reference to "pension adders," Allen further stated that "nearly half of all production workers will earn pension increases ranging from 3.3 percent to 12.7 percent as a result of this grade-level consolidation."

Shortly after the CWA membership received Allen's letter, the CWA members voted to end the strike, based in part on the recommendation of the national CWA leadership. A key reason for the CWA's recommendation was AT&T's promise that current employees would be protected against income erosion caused by AT&T's wage-level consolidation and elimination of plugs and pension adders. In its final bargaining report to the membership, the CWA stated:

> In recognition of the changing structure in the manufacturing environment, CWA and AT&T have agreed to eliminate the Wage Incentive Plans. Workers will be compensated for this change through a restructuring of hourly pay through the Manufacturing Grade Level Consolidation Plan combined with a special hourly payment supplement. Wage Incentive workers and any day workers on the payroll as of June 1, 1988 who performed wage incentive work at any time over the past three years will be eligible for the special hourly payments. *These payments will continue as long as the worker remains in a production occupation level (or tester occupation level in Merrimack Valley and the North Carolina Works).*

(Emphasis added). The final approved draft of the agreement, known as the "MFG-3" agreement, also reflected the understanding that current employees would receive plugs for the duration of their employment with AT&T:

> Payment of this [supplementary wage] allowance shall begin as of the effective date of such reclassification and will continue as

long as the employee remains in a PRO-DUCTION OCCUPATION LEVEL.

See Joint Appendix ("J.A.") at 54 (provision applicable to Kansas City employees), 56 (provision applicable to North Carolina employees), 60 (provision applicable to Phoenix employees).

The MFG-3 agreement, of which the wage-supplement provisions were a part, took effect on June 29, 1986. The agreement was to be in effect for three years, through June 1989. Beginning in January 1988, AT&T announced that it was going to close or downsize various manufacturing plants around the country. On January 20, 1988, for example, AT&T announced the closing of the North Carolina Works. Almost immediately, local CWA officials met with national CWA officials and AT&T labor relations representatives to ascertain whether displaced North Carolina employees who transferred to other plants would continue to receive their wage supplements. AT&T's initially took the position that wage supplements would not be portable because the IBEW, which represented AT&T production workers at certain other facilities, would object to a situation in which some production workers at a facility received wage supplements while others did not.[2]

In June 1988, AT&T agreed to pay wage supplements through June 1989 to all North Carolina Works employees, including those who had transferred to an IBEW location. Ron Allen (the national CWA president and the lead CWA negotiator) and J.J. Dowdall (an AT&T negotiator) further agreed that all workers who transferred from the North Carolina Works, including those who transferred to AT&T facilities where applicable collective-bargaining agreements did not provide for wage supplements, would receive a one-time lump-sum payment calculated based on their wage-supplement rate immediately before their transfer date, times a multiplier to account for factors such as overtime hours worked. These negotiations resulted in the adoption of the 1989 "MFG-4 Master Agreement," in which the CWA was able to retain

---

**2.** Plaintiffs assert in their brief that "there is nothing in the IBEW's collective bargaining agreement that precludes such payments [of wage supplements]," and this assertion is not contradicted by the record evidence.

provisions for the payment of wage supplements at all of the facilities at which these supplements had been paid under the MFG–3 agreement (except at the North Carolina Works, which had been closed). The eligibility and formula for both benefits was the same as that agreed upon as the result of the 1986 negotiations.

The MFG–4 Master Agreement provided little solace for the plaintiffs in this case, however. Beginning in 1989, the plaintiffs transferred from the defunct North Carolina Works, the Phoenix Works, and the Kansas City Works to AT&T's Columbus Plant. At the time they transferred to Columbus, the former Kansas City and Phoenix employees had been receiving their wage supplements, while the CWA was negotiating with AT&T about the right of North Carolina employees to continue receiving wage supplements. Upon their transfer to Columbus, however, all plaintiffs stopped receiving wage supplements.[3]

The plaintiffs unsuccessfully sought assistance from both the CWA and the IBEW. The plaintiffs' conundrum was that the CWA was no longer their bargaining representative and could not bargain on their behalf, while the IBEW could not bring a grievance to enforce a right created under an agreement to which it was not a party. The plaintiffs therefore filed this action.

## II

The plaintiffs filed their original complaint on September 6, 1994, in the United States District Court for the Southern District of Ohio. As a result of a district court order requiring that the CWA be joined as an involuntary plaintiff and that the IBEW and its local affiliate be joined as involuntary defendants, the plaintiffs filed an amended complaint on April 27, 1995. In their amended complaint (which invoked Section 301(a) of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185(a)), plaintiffs al-

leged that they had been wrongly deprived of wage and retirement benefits (to wit, the nonpayment of their wage supplements and pension adders). They therefore sought damages representing the amount of lost wage supplements and pension adders. Plaintiffs also asserted an estoppel theory, presumably based on statements made by Robert Allen and members of AT&T's negotiation team assuring the CWA membership that wage-supplement and pension-adder benefits would be paid for the duration of the CWA members' employment with AT&T. Finally, plaintiffs sought punitive damages of at least $4 million, plus attorney's fees.

In March 1996, after taking discovery, AT&T moved for summary judgment. AT&T argued principally that the CWA was not legally empowered to negotiate for benefits that would follow workers to facilities at which the CWA was not their designated bargaining representative; that the plaintiffs lacked standing to bring this action in their individual capacities, since they were not signatories to the MFG–3 agreement; that the plaintiffs' claims were barred by accord and satisfaction; that their claims were time-barred; and that the plaintiffs had failed to exhaust their administrative remedies. AT&T also proffered a letter from Ron Allen, the CWA's lead negotiator, stating that in fact the CWA had not bargained for wage-supplement benefits that would be portable between CWA and non-CWA facilities.

In response, the plaintiffs filed a cross-motion for partial summary judgment in which they argued that there was no genuine dispute as to AT&T's liability to pay wage-supplement and pension-adder benefits to Columbus employees who had transferred from the Kansas City, North Carolina, and Phoenix plants. The plaintiffs also advanced, for the first time, a theory of recovery premised on the idea that AT&T's failure to pay pension adders was a violation of the Employee Retirement Income Security Act ("ERISA"). Among other things, the plain-

---

**3.** Perhaps tellingly, AT&T's position at the time was not only that employees formerly represented by the CWA could not receive wage supplements when they transferred to IBEW facilities, but even that employees formerly employed at one CWA facility could not continue to receive wage supplements when they transferred to a different CWA facility. This position was rejected in May 1993, when an arbitrator ruled that wage supplements were portable among different CWA facilities.

tiffs supported their motion with affidavits from several individual plaintiffs, stating that they understood CWA and AT&T representations to mean that they would receive wage supplements and pension adders for the duration of their AT&T employment, that they never accepted any payments from AT&T as an accord and satisfaction of future claims for wage-supplement or pension-adder payments, that the CWA and the IBEW had refused to file grievances on their behalf, and that they detrimentally relied on AT&T's promises of portable benefits in accepting transfers to the Columbus facility.

On November 26, 1996, the district court granted AT&T's motion and denied plaintiffs' motion. The district court's conclusion was simple: "plaintiffs, now represented exclusively by [IBEW] Local 2020, cannot, as a matter of law, claim plugs under the MFG-3 Agreement negotiated by the Communications Workers [of America]." The district court relied heavily on an unreported district court decision from Florida, *Adams v. AT&T Co.*, No. 94–580–CIV–ORL–18 (M.D.Fla. Feb. 1, 1996), in which the Florida district court rejected claims of AT&T employees who worked at AT&T's Orlando, Florida, facility pursuant to a labor agreement negotiated while the employees worked at another AT&T facility where they were represented by a different union. The district court refused to rely on a line of cases, including Sixth Circuit cases, that recognize the possibility of portable "evergreen" or "status" benefits[4] that outlive the duration of the labor agreement that created them; according to the district court, these cases involved only the question of whether *retirees* could claim benefits after the expiration of a labor agreement, and did not address the case of employees who continue working but are represented by a union different from the one that negotiated the agreement in question. The district court additionally held that plaintiffs' promissory-estoppel claim was preempted by the LMRA, and that their ERISA claim was not fairly pleaded in the complaint.

On December 23, 1996, plaintiffs filed a timely notice of appeal. The notice of appeal is captioned "Roberta E. Anderson et. [sic] al., Plaintiffs, vs AT&T Corp., et. [sic] al., Defendants." The body of the notice of appeal reads as follows: "Notice is hereby giiven [sic] that Roberta E. Anderson et al., plaintiffs above named, hereby appeal to the United States Court of Appeals for the Sixth Circuit the final decision and order entered in favor of defendant AT&T Corp. and against plaintiffs Roberta E. Anderson et. [sic] al., on their motions for summary judgement entered in this civil action on the 26th day of November, 1996."

### III

This appeal raises five distinct legal issues. We address each issue in turn.

### A

■ AT&T argues that this appeal must be dismissed because the plaintiffs did not name the CWA, the IBEW, and Local 2020 of the IBEW as defendants in the notice of appeal. While this argument may have had merit before the 1993 amendments to the Federal Rules of Appellate Procedure, in 1993, Fed. R.App. P. 3(c) was amended to provide that "[a]n appeal will not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." The advisory committee notes to Rule 3(c) specifically state that this amendment was adopted to permit the use of "et al." in a case caption to designate multiple parties. *See* Fed. R.App. P. 3(c), Advisory Committee Note, 1993 Amendment. In particular, these amendments were designed to avert the harsh results reached under the old version of the rule in cases like *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), and *Walsh v. Ford Motor Co.*, 945 F.2d 1188 (D.C.Cir.1991), where the Supreme Court and the District of Columbia Circuit, respectively, held that there was no jurisdiction over a party not personally named in the

---

**4.** CWA president Ron Allen testified in deposition that an "evergreen" or "status" provision in a collective bargaining agreement is a provision

"that would have a life that might go beyond the existence of the collective bargaining agreement."

notice of appeal, even if the notice used the phrase "et al." Here, it is clear from the notice of appeal that plaintiffs meant to appeal from the summary judgment order dismissing this case as against all defendants, including the defendants made party involuntarily by order of the district court. Accordingly, we find no merit to AT&T's argument that the appeal should be dismissed due to a defective notice of appeal.

**B**

AT&T also argues that the appeal must be dismissed because the individual plaintiffs are not themselves signatories to the MFG–3 agreement that is the basis of the lawsuit. According to AT&T, this fact deprives the plaintiffs of standing and this court of jurisdiction; AT&T essentially argues that the contract claim here, if any, belongs to the union, and can only be asserted either by the union itself, or by the employees in a lawsuit that seeks relief from the union for breach of its duty of fair representation. We disagree. It is true that Section 301 of the LMRA speaks in terms of labor organizations, on the one hand, and employers, on the other—with no mention made of the rights of individual employees. *See* 29 U.S.C. § 185. It is also true that the most common kind of Section 301 case is the so-called "hybrid" case, in which employees sue both their union, for breach of the duty of fair representation, and their employer, for breach of a collective bargaining agreement. However, the Supreme Court has made clear that fair-representation suits against unions are not inextricably linked to Section 301 suits against employers. *See Breininger v. Sheet Metal Workers Int'l Ass'n,* 493 U.S. 67, 86, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989) ("a fair representation claim is a separate cause of action from any possible suit against the employer"). We therefore must decide if this is the kind of case that can proceed solely against the employer.

In developing the principle stated by the Supreme Court in *Breininger*—that a Section 301 cause of action against an employer is logically distinct from a fair-representation cause of action against a union—we have recognized a number of situations in which individual plaintiffs, not personal signatories to a collective bargaining agreement, may nonetheless sue an employer for breach of a collective bargaining agreement without also suing the union. The most common is the situation in which the union owes no duty to the plaintiff because the plaintiff is not a member of the bargaining unit represented by the union. In these cases, we have long recognized that the plaintiff can recover for the employer's breach of a collective bargaining agreement if the plaintiff is a third-party beneficiary of the agreement. *See, e.g., United Food & Commercial Workers Local 951 v. Mulder,* 31 F.3d 365, 370 (6th Cir. 1994) ("[a]lthough § 301 contemplates suits between unions and employers for breaches of collective bargaining agreements, it also permits individual employees to sue as third-party beneficiaries of collective bargaining agreements"); *Central States Southeast & Southwest Areas Pension Fund v. Kraftco, Inc.,* 799 F.2d 1098, 1107 (6th Cir.1986) (to same effect); *Hazen v. Western Union Telegraph Co.,* 518 F.2d 766, 769–70 (6th Cir. 1975) (to same effect).

The present case fits nicely within this line of precedent. First, the plaintiffs here have no fair-representation claim against either the CWA or the IBEW because neither union has the authority to assert claims on their behalf under the MFG–3 agreement. *See Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (noting that union owes no duty of representation to individuals who are not members of the bargaining unit). Second, the plaintiffs plainly qualify as third-party beneficiaries of the MFG–3 agreement, inasmuch as that agreement specifically provided for certain fixed wage supplements and pension adders for the plaintiffs and all other AT&T employees in specified production jobs. *See Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 469, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960) (noting that common-law formalities of third-party beneficiary contracts do not apply in the LMRA context, and that a promise in a collective bargaining agreement to pay certain wages to employees makes those employees third-party beneficiaries of the agreement for purposes of Section 301).

Finally, we cannot accept AT&T's blanket argument that "[i]ndividuals do not have standing to enforce rights under a collective bargaining agreement when those rights belong to the collective whole"; the Supreme Court held a generation ago that the policy considerations underlying Section 301 "foreclose [a] reading of § 301 to exclude all suits brought by employees instead of unions." *Smith v. Evening News Ass'n,* 371 U.S. 195, 200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). By definition, all rights under a "collective bargaining agreement" belong to the collective whole. But where, as here, those rights are specific wage and pension guarantees applicable to specific, identifiable employees, they may be asserted by those individual employees as third-party beneficiaries of the agreement.

### C

■ AT&T next argues that plaintiffs' claims are time-barred because the Supreme Court adopted a six-month limitations provision for Section 301 cases in *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).[5] This argument misapprehends the holding of *DelCostello,* where the Supreme Court took great pains to make clear that there is no generally applicable limitations period for Section 301 claims; instead, the appropriate limitations period depends on the particular claims raised in the case. *See id.* at 162, 103 S.Ct. 2281. The Court began with the proposition that it has "generally concluded that Congress intended that the courts apply the most closely analogous statute of limitations under state law." *See id.* at 158, 103 S.Ct. 2281. Concluding that the 90–day state-law limitations provision was too short given the facts of the case at hand, however, the Court in *DelCostello* opted to borrow the six-month statute of limitations applicable to federal-law claims of unfair labor practices. The Court's rationale was that, because the plaintiff's claim in *DelCostello* involved both the employer's breach of a collective bargaining agreement (a contract claim that would have been subject to a 90–day state limitations

period) and the union's breach of its duty of fair representation (an unfair labor practice subject to the longer six-month period under federal law), it was appropriate to apply the longer limitations period. *See id.* at 171–72, 103 S.Ct. 2281.

Applying this reasoning, we have specifically held that a Section 301 suit brought by an individual as third-party beneficiary of a collective bargaining agreement is not subject to the six-month limitations period applied in *DelCostello. See Apponi v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1216 (6th Cir.1987); *Central States,* 799 F.2d at 1107–08. Rather, it is subject to the most analogous state limitations period—here, Ohio's 15–year limitations period for actions on written contracts. *See* Ohio Rev.Code § 2305.06. There can be no dispute that the plaintiffs filed their complaint well within this period, and we therefore decline to dismiss the case on limitations grounds.

### D

■ We come now to the real substance of the district court's holding as challenged on appeal: the proposition that, as a matter of federal labor law, a collective bargaining agreement cannot confer benefits on employees in one bargaining unit that survive the employees' transfer to another bargaining unit in which they are represented by a different union. This proposition implicates two of the most fundamental principles of labor law: first, the principle that the majority of the employees at a particular plant or other facility are entitled to select a single, exclusive bargaining representative to negotiate on their behalf, *see* 29 U.S.C. § 159(a); and second, the principle that collective bargaining agreements should be construed to effectuate the intent of the parties as expressed through the terms of the agreement, including provisions entitling employees to benefits after they leave the jobs they held at the time the agreement was negotiated. *See International Union, UAW v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). AT&T argues that the

---

**5.** AT&T argues that plaintiffs, who transferred to the Columbus Plant by 1991 at the latest and who filed this action in 1994, are well outside the purported six-month limitations period.

first principle limits the second, such that an agreement may confer benefits to which employees are entitled even after expiration of the agreement, or even after the employees retire and thus cease to be represented by the union, but not after the employees become represented by another labor union. Plaintiffs, by contrast, contend that any "evergreen" or "status" rights that vest under a collective bargaining agreement may be fully portable, depending on the intention of the parties, not only with respect to employees who retire or who transfer to another unit subject to representation by the same union, but also with respect to employees who transfer to another unit subject to different union representation.

While this dispute is one of first impression not only in this circuit, but apparently in any federal appeals court, nonetheless three legal propositions that bear heavily on the outcome are well established. First, the Supreme Court has held that parties to a collective bargaining agreement may agree to a provision conferring benefits that accrue during the period in which the agreement is effective, but that are not actually paid until after the expiration of the agreement. *See John Wiley & Sons v. Livingston,* 376 U.S. 543, 554–55, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) ("We see no reason why parties could not if they so chose agree to the accrual of rights during the term of an agreement and their realization after the agreement had expired."). Second, we have held that parties to a collective bargaining agreement may agree to "evergreen" or "status" benefits that are payable not only after expiration of the agreement, but even after termination of the employment of individuals claiming such benefits. *See Yard–Man,* 716 F.2d at 1479–80 (holding that plant closure and related employee retirements did not relieve employer of obligation to pay "nonterminating lifelong insurance benefits for the Yard–Man retirees"). Third, this court (and most other courts) have recognized that LMRA breach-of-contract cases are governed by "[m]any of the basic principles of contractual interpretation" *id.* at 1479, including the principle that "the court should first look to the explicit language of the collective bargaining agree-

ment for clear manifestations of intent." *Ibid.*

The collective bargaining agreements applicable to plaintiffs, each of whom transferred to Columbus from either Kansas City, North Carolina, or Phoenix, contain clear provisions relating to the payment of wage supplements. Each agreement contains a provision stating that "[t]hese special hourly payments shall begin as of June 29, 1986, and will continue as long as the employee remains in a PRODUCTION OCCUPATION LEVEL." *See* J.A. at 55 (MFG–3 provision applicable to Kansas City employees), 56 (North Carolina employees), 60 (Phoenix employees). There is no dispute that all the plaintiffs in this case are in "production occupation level" positions at the Columbus Plant. According to the express provision of the agreement, therefore, they appear to be entitled to their wage supplements.

AT&T's sole argument to the contrary is based on an unreported district court decision from Florida. In *Adams v. AT&T Co.,* the district court confronted a fact situation essentially identical to that presented in this case: AT&T employees formerly represented by the CWA transferred from the Kansas City and North Carolina plants to a plant in Orlando, Florida, where the bargaining representative was the IBEW. The district court recognized the enforceability of "benefits negotiated by unions for retirees who are no longer active participants in a bargaining unit." *See* J.A. at 254 (reprinting district court's unreported decision; citing *United Food & Commercial Workers Int'l Union v. Dubuque Packing Co.,* 756 F.2d 66 (8th Cir. 1985), and *Yard–Man,* 716 F.2d 1476). The district court also recognized that "unions may negotiate provisions that can be enforced even if an employee is transferred away from a bargaining unit." *Ibid.* (citing *United Food & Commercial Workers Union v. Alpha Beta Co.,* 736 F.2d 1371 (9th Cir. 1984)). However, without citing any authority, the district court went on to hold that "[b]ecause Plaintiffs have transferred to another facility where IBEW is their exclusive representative with regard to wages, Plaintiffs can no longer reap benefits negotiated

by CWA with regard to their constituents." *See id.* at 255.

Given the number of different circumstances in which courts have enforced the "evergreen" or "status" rights of employees no longer represented by the union that negotiated the rights, we find the *Adams* decision to be unpersuasive (and, being unreported, to have little or no precedential value even within its own jurisdiction). The facts relied on by the district court there—that, under the LMRA, an employee may have only one bargaining representative, and that the employees claiming benefits were represented by a union with no power to assert claims based on a collective bargaining agreement negotiated by a different union— are of no moment in a case where employees are claiming true "status" benefits, because it is the individual employee and not the union who has a cause of action to recover those benefits under Section 301. As we said in *Yard–Man:*

> The appellants misapprehend the meaning of *Pittsburgh Plate Glass* insofar as vested retiree benefits are concerned. Clearly, the union may choose to forego such benefits in future negotiations in favor of more immediate compensation. It may not, however, bargain away retiree benefits which have already vested in particular individuals. Such rights, once vested upon the employee's retirement, are interminable and the employer's failure to provide them actionable under § 301 *by the retiree.*

*Yard–Man,* 716 F.2d at 1482 n. 8 (emphasis added).

We can ascertain no principled distinction between a case where an employee retires and then personally files a lawsuit claiming lifetime retirement benefits and a case where an employee transfers to a location with different union representation and then files a lawsuit claiming wage-supplement benefits to which he is entitled for the duration of his company employment. In each case, the plaintiff is no longer a member of the bargaining unit covered by the original collective

bargaining agreement that gave rise to the benefits in question. Moreover, in each case, the plaintiff sues to vindicate vested contract rights. In these circumstances, AT&T's position, based as it is on the exclusive-representation provision of the LMRA, is a red herring. It need not distract us from the relatively simple contract dispute at issue.

"Simple," we say, because on appeal AT&T does not argue that the MFG–3 agreement means something other than what it explicitly says: that each employee in the relevant bargaining units in 1986 (including, *a fortiori,* the plaintiffs here) was entitled to payment of wage supplements "as long as the employee remains in a production occupation level" position. It is difficult to imagine a contract promise less ambiguous than that, and, as explained above, there is no legal reason why such a promise is unenforceable even when the beneficiary of the promise moves to a new bargaining unit with different union representation. We therefore will reverse both the district court order granting AT&T's motion for summary judgment and the order denying the plaintiffs' motion for summary judgment. *Cf. Tamarind Resort Assocs. v. Government of the Virgin Islands,* 138 F.3d 107, 109 (3d Cir.1998) (where contract terms are unambiguous, meaning of contract is question of law resolvable on summary judgment).

### E

Though not necessary to our disposition, we pause to note AT&T's argument that the plaintiffs' request that AT&T be estopped from denying its liability for future wage-supplement payments is preempted by Section 301.[6] Addressing this argument, the district court stated that "as AT&T correctly points out, plaintiffs' purported estoppel claim is preempted. *See Jones v. Truck Drivers Local Union No. 299,* 838 F.2d 856, 860 (6th Cir.1988)." The district court's opinion was incorrect in two respects. First, the *Jones* case does not even mention the words "estoppel," "estop," or "estopped,"

6. The plaintiffs' estoppel theory is based principally on the letter from Robert Allen representing that wage supplements and pension adders would be paid to employees who worked in CWA bargaining units in 1986 for the duration of their careers as production workers at AT&T, and the plaintiffs' alleged detrimental reliance (to wit, ending the strike) thereon.

much less hold that all principles of estoppel are preempted (or, more precisely, nullified) by the LMRA. Second, we do not read plaintiffs' complaint to assert estoppel (promissory, equitable, or otherwise) as an independent claim for relief; it merely states that AT&T should be "estopped from denying" that it is liable for future wage-supplement payments to plaintiffs.

The federal common law of contract applicable under the LMRA includes the doctrine of promissory estoppel. *See Apponi v. Sunshine Biscuits, Inc.* 809 F.2d 1210, 1217 (6th Cir.1987). "The elements constituting estoppel, as defined by federal common law, are: (1) conduct or language amounting to a representation of material facts; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on or act such that the party asserting the estoppel has a right to believe it so intended; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must detrimentally and justifiably rely on the representation." *Ibid.* While AT&T disputes this, it is reasonably clear that each of these elements is satisfied by the letter of Robert Allen described above.

First, Allen's statement that "[t]hese payments will be made to employees for as long as they're employed by the company" certainly sounds to us like a representation of material fact. Second, while AT&T asserts that there is no evidence showing Allen to have been aware of the true facts, the fact that Allen had apparent authority to make such a promise is sufficient to satisfy (or at least to stand in for) the awareness element. *Cf. Lucas v. Bechtel Corp.*, 800 F.2d 839, 847 (9th Cir.1986) (upholding reliance claim under LMRA based on corporate executive's apparent authority to bind company). Third, Allen clearly intended the CWA members to rely on his representation that the wage-supplement and pension-adder benefits would last for the duration of their employment with AT&T; the stated purpose of the letter was to persuade CWA members to end a costly strike and accept AT&T's contract offer. Fourth, even AT&T appears to concede that plaintiffs were unaware of the true facts at the time they ratified the MFG–3 agreement; AT&T relies exclusively on the proposition that plaintiffs should have been aware by *1989* that wage-supplement payments would not be made to transferees to the Columbus Plant—but this is three years after plaintiffs relied on AT&T's promise and voted to ratify the contract. Finally, there appears to be no genuine dispute as to whether plaintiffs actually relied on AT&T's promises; they have submitted sworn affidavits averring that they did so rely, which is valid evidence under Fed.R.Civ.P. 56.

In sum, while the clear contract language involved allows us neatly to resolve the plaintiffs' claims for relief, the record could well have supported a similar result on an estoppel theory. Contrary to the district court's holding, there is nothing in our cases that excludes the various doctrines of estoppel from the federal common law of contract the governs suits brought under the LMRA.

## IV

For the foregoing reasons, the judgment of the district court is REVERSED, and the case is REMANDED to the district court with instructions to grant the plaintiffs' motion for partial summary judgment.