**Daniel R. BAIRD, Plaintiff,**

v.

**BURLINGTON NORTHERN AND SANTA FE RAILROAD COMPANY, and United Transportation Union, Defendants.**

**Civil No. 98–2499 (JRT/RLE).**

United States District Court,
D. Minnesota.

March 13, 2001.

Bruce A. Schoenwald, Stefanson, Plamback, Foss & Fisher, Moorhead, MN, for Daniel R. Baird.

Kevin C. Brodar, Associate General Counsel, United Transportation Union, Cleveland, OH, Courtney LeNeave, Hunegs, Stone, Leneave, Kvas & Thornton, Minneapolis, MN, for United Transportation Union.

## MEMORANDUM OPINION AND ORDER GRANTING UNITED TRANSPORTATION UNION'S MOTION FOR SUMMARY JUDGMENT

TUNHEIM, District Judge.

This is a duty of fair representation case arising under the Railway Labor Act (the "RLA"), 45 U.S.C. §§ 151 *et seq.*[1] Plaintiff sues defendant, the United Transportation Union (the "UTU"), claiming that the union breached its duty of fair representation when it refused to represent plaintiff in his grievance with plaintiff's employer, the Burlington Northern Sante Fe Railroad Company ("BNSF").[2] Plaintiff believes he is entitled to benefits under an interdivisional service agreement between the UTU and BNSF. Plaintiff also asserts a claim of intentional infliction of emotional distress against the UTU. The UTU now moves for summary judgment. For the reasons that follow, the Court grants its motion.

### BACKGROUND

The railroad industry divides its employees into various classes and crafts for purposes of collective bargaining. The craft at issue in this case is what the industry calls the "operating crafts"—those crafts directly involved in the movement of trains. The operating crafts are divided into two separate classifications: 1) engine service and 2) train service. The engine service craft consists of engineers and its certified representative is the Brotherhood of Locomotive Engineers (the "BLE"). The train service craft consists of conductors and brakemen and its certified representative is the UTU.

---

1. Although plaintiff originally plead federal question jurisdiction under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, the Court construed plaintiff's complaint to plead jurisdiction under the RLA in its August 12, 1999 Order denying the UTU's motion to dismiss.

2. In his complaint, plaintiff also sued BNSF, however, the Court granted BNSF's motion to dismiss by order dated August 12, 1999.

Beginning in the mid–1980s, BNSF decided to eliminate a terminal in Staples, Minnesota and run what is known as "interdivisional service" from Minneapolis to Dilworth, Minnesota. To implement this change, BNSF entered into two separate agreements, one with the BLE for engineers (the "BLE Agreement"), the other with the UTU for train service employees (the "UTU Agreement"). BNSF and the BLE entered into its agreement in 1985, however, implementation of the agreement did not occur until 1988. According to amended section 1(b) of the BLE Agreement, engineers who were home terminaled at Staples on February 15, 1988, were certified as adversely affected. Several years later, BNSF entered into negotiations with the UTU to eliminate train service from the Staples terminal. Although the UTU Agreement was signed on November 5, 1993, it was not implemented until March 21, 1994.

Plaintiff began working for BNSF in 1979 as a train service employee in Grand Forks, North Dakota. In 1984, he was transferred to Staples, Minnesota in train service, where he remained for the next ten years. In 1988, plaintiff entered the Locomotive Engineers Training Program, which he completed on July 9, 1989. Beginning in 1990, plaintiff worked intermittently as an engineer, but according to plaintiff's complaint he remained a conductor in the train service craft. On February 28, 1994, plaintiff received official notice from BNSF to report to Grand Forks on March 3, 1994 as an engineer.[3] Plaintiff has worked as an engineer and member of the engine craft ever since, however, he remained in Grand Forks only until April 24, 1994, at which time he was transferred to Dilworth.

On March 21, 1994, BNSF implemented the UTU Agreement for train service employees in Staples, Minnesota. After the run-through, many employees, including plaintiff, filed claims with BNSF claiming they qualified for the benefits under the UTU Agreement. Plaintiff was notified a few months later by Robert Tangen, the UTU local chairperson, that the UTU would not handle his claim because at the time of the UTU Agreement's implementation, plaintiff was an engineer under the BLE Agreement. For the next four years, plaintiff pursued his claim at the various levels of administration claiming he qualified for benefits under the UTU or the BLE agreement. Plaintiff was represented by the BLE throughout this process.

On August 14, 1998, the Public Law Board issued its decision. The Board concluded that plaintiff did not qualify for benefits under the BLE Agreement because he finished his engineering training in 1989, over a year after the date upon which engineers were certified as adversely affected under the BLE Agreement. The Board also noted that plaintiff did not fall under the UTU Agreement because that agreement covered only conductors, brakemen and firemen working at Staples Minnesota as of March 21, 1994. Because plaintiff was working as an engineer in Grand Forks on that date, he did not qualify for benefits under the agreement.

Three months after the Board's ruling, plaintiff filed this action against BNSF and the UTU claiming, among other things, that the UTU breached its duty of fair representation. Both BNSF and the UTU filed motions to dismiss. The Court granted BNSF's motion, but denied the UTU's motion on the basis that the Court had subject-matter jurisdiction under the RLA to entertain plaintiff's duty of fair representation claim. This matter is now before the Court on the UTU's motion for summary judgment.

---

**3.** Plaintiff's transfer from conductor to engineer was considered a promotion.

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, a court is required to view the facts in a light most favorable to the nonmoving party. *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### II. Duty of Fair Representation Claim

#### A. Duty

The UTU contends that it did not owe plaintiff a duty to represent him in his grievance for benefits under the UTU Agreement because, as of March 3, 1994, plaintiff was no longer a member of the train service craft for which the UTU was its exclusive representative.

Plaintiff argues that the UTU owes him a duty of representation because his rights under the agreement vested on November 5, 1993, the date upon which the UTU and BNSF signed the agreement.[4] In support of his vested rights theory, plaintiff relies heavily on *Anderson v. AT&T Corp.*, 147 F.3d 467 (6th Cir.1998), in which the court

allowed plaintiffs to claim benefits under their former union agreement even though they had been transferred to a different union and fell under a different union agreement. *Id.* at 475. Plaintiff claims the same should hold true here. Because plaintiff was a member of train service craft on the date the UTU agreement was signed, his rights under the agreement vested on that date. Therefore, he can still claim benefits under the agreement even though he is no longer a member of that union.

Although section 22 of the UTU Agreement renders the determination of when benefits accrue under the contract somewhat ambiguous, a review of the specific contract provisions relating to the benefits at issue in this case indicate that implementation of the UTU Agreement is the date upon which benefits accrue. Section 19(a) and the provisions discussed therein, provide, in relevant part:

> Conductors, brakemen and firemen, who are affected as a result of this agreement, and who have not previously participated in receiving similar benefits allowable under the Brotherhood of Locomotive Engineers agreement applicable to interdivisional service in this corridor, shall, pursuant to Section 7, Article IX of the October 31, 1985 UTU National Agreement, be afforded the protective conditions set forth in Article XIII of the January 27, 1972 UTU National Agreement.

Section 7, Article IX of the October 31, 1985 UTU National Agreement provides that:

> The provisions of Article XIII of the January 27, 1972–Agreement shall apply to employees adversely affected **by the application of** [interdivisional service].

---

4. Section 22 of the UTU Agreement provides: This agreement shall be effective upon the date signed and may be implemented by the

Carrier at any time thereafter.

(Emphasis added.) Article XIII of the January 27, 1972 UTU National Agreement states, in relevant part:

> The scope and purpose of this Article XIII are to provide, to the extent specified herein, for fair and equitable arrangements to protect the interests of certain of the carriers' employees represented by the United Transportation Union who are **adversely affected by the application of ... Interdivisional Service ...** [5]

(Emphasis added.)

■ The intent of the parties who negotiated the UTU Agreement further supports the conclusion that adverse affect benefits were directly tied to the implementation date of interdivisional service from Staples to Dilworth. *Anderson*, 147 F.3d at 474 ("collective bargaining agreements should be construed to effectuate the intent of the parties as expressed through the terms of the agreement"). Both parties who negotiated the agreement, BNSF and the UTU General Chairperson Richard Marceau, understood that an employee's rights to benefits under section 19(a) of the agreement depended on being a member of the train service craft on the date of implementation. It is also significant that the neutral member of the Public Law Board concurred with this interpretation of the agreement.

■ The Court is also not persuaded that the UTU Agreement created the kind of vested or portable evergreen rights at issue in *Anderson*. In *Anderson*, plaintiffs claimed rights to supplemental wage and pension benefits under their former collec-

tive bargaining agreement even though they had since transferred to a different bargaining unit in which they were represented by a different union. *Id.* at 475. The agreement under which plaintiffs claimed benefits provided that the "special hourly payments shall begin as of June 29, 1986, and will continue as long as the employee remains in a PRODUCTION OCCUPATION LEVEL." *Id.*

The Sixth Circuit held that plaintiffs, who were union members under the agreement on June 29, 1986, were entitled to continue collecting the benefits after their transfer because they continued to work in a production occupation level with AT & T. *Id.* In contrast, the protections afforded by section 19(a) of the UTU agreement were not immediately ascertainable but rather lay dormant until implementation of interdivisional service occurred. Although the parties could have contracted for benefits to accrue immediately or upon a set date other than implementation, they did not.[6]

### B. Breach of Duty

■ Plaintiff is unable to establish a breach of the UTU's duty of fair representation. It is well-established that a union breaches its duty of fair representation only where its conduct is "arbitrary, discriminatory or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Smith v. United Parcel Serv., Inc.*, 96 F.3d 1066, 1068 (8th Cir.1996). In this case, the focus is on the arbitrary prong of the *Vaca* test.

---

5. The definitions section of Article XIII of the 1972 Agreement defines "Implementation" as the **application** and implementation of the provisions of Article XII—Interdivisional Service of this Agreement.

6. It is also significant that plaintiff's transfer on March 3, 1994 was a permanent transfer

to the engine service craft. A closer question concerning the UTU's duty to protect plaintiff's interests might be presented had plaintiff been called up as an engineer only temporarily, as was the case in previous years, yet remained a member of the train service craft.

A union's conduct is arbitrary if, "considering all the circumstances at the time of the union's actions, its behavior is 'so far outside a wide range of reasonableness' as to be irrational." *Smith*, 96 F.3d at 1068 (quoting *Beavers v. United Paperworkers Int'l Union, Local 1741*, 72 F.3d 97, 100 (8th Cir.1995)). "Mere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation." *Buford v. Runyon*, 160 F.3d 1199, 1202 (8th Cir.1998). A union does not act arbitrarily simply because it does not pursue a grievance that it has decided, in good faith, lacks merit. *Schmidt v. International Brotherhood of Electrical Workers, Local 949*, 980 F.2d 1167, 1170 (8th Cir.1992); *Schiltz v. Burlington Northern Railroad*, 115 F.3d 1407, 1415 (8th Cir.1997) (plaintiff must demonstrate **both** that the underlying grievance has merit and that the union failed to fairly represent him). However, "a union cannot arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." *Vaca*, 386 U.S. at 900.

At oral argument, plaintiff's counsel asked the Court to focus on the arbitrariness of the UTU's conduct throughout this process. Specifically, plaintiff argues that the UTU acted arbitrarily and thus irrationally by refusing to consider plaintiff's grievance, failing to look into his transfer to Grand Forks three weeks prior to implementation of interdivisional service, reconsidering adverse affect claims of employees at the Mandan terminal but not Staples, and certifying only a small number of employees as adversely affected by implementation.

The Court has carefully reviewed each of plaintiff's arguments in the light most favorable to him, however, the Court is unable to find that the UTU's conduct rises to the level of arbitrariness set forth in the standards discussed above. First, the UTU's decision not to grieve plaintiff's claim was not so arbitrary as to be irrational. The UTU reached its decision based on its understanding that only conductors, trainmen and firemen working in Staples on the date of implementation qualified for adverse affect benefits under Section 19(a) of the UTU Agreement.

While plaintiff might disagree with this interpretation, the UTU's determination that plaintiff did not qualify under the agreement was, at a minimum, a plausible interpretation. Indeed, the UTU's interpretation was shared by BNSF and a federal neutral at plaintiff's hearing before the public law board. *See Schiltz*, 115 F.3d at 1415 (union did not breach its duty of representation where NRAB independently determined that plaintiff's claim lacked merit). This case is also distinguishable from more typical duty of fair representation cases in that the UTU was no longer plaintiff's union representative at the time it was asked to file a grievance on plaintiff's behalf. Thus, under these facts and circumstances, the Court finds that the UTU's decision not to grieve plaintiff's claim was not "so far outside the wide range of reasonableness" as to be irrational.

The Court also finds that the UTU did not act arbitrarily or in bad faith in not looking into plaintiff's transfer to Grand Forks as an engineer three weeks prior to implementation of the UTU Agreement. The record indicates that the UTU's duty extended only to ensuring that BNSF initially offer engineer promotions to conductors in train service prior to considering other candidates. In this instance, the UTU was relieved of any duty to investigate because BNSF complied with its contractual obligations in its selection of plaintiff.

The record also indicates that the UTU did not arbitrarily re-open adverse affect claims at the Mandan terminal but

not others. As the Filter affidavit and other documents explain, the UTU reconsidered claims in Mandan after it was discovered that BNSF provided erroneous wage information for two Mandan employees. No such errors were discovered in other locations, including Staples. In light of these facts, the UTU's presumption that errors were limited to the Mandan terminal was not irrational.

Finally, although the actual pool of employees who were determined adversely affected by the transfer was small, there is no evidence to support plaintiff's contention that the UTU made the determinations in an arbitrary fashion. The Court has reviewed the adverse affect documents submitted in the record and is satisfied that a structured and fair process was applied.[7] The Court thus holds that the UTU's conduct was not arbitrary as a matter of law.

### III. Intentional Infliction of Emotional Distress Claim

 Plaintiff also asserts a claim for intentional infliction of emotional distress against the UTU. Even if this claim was not pre-empted, as argued by defendant, plaintiff fails to provide sufficient evidence to support his claim. To sustain a claim for intentional infliction of emotional distress, plaintiff must show that (1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) it caused emotional distress; and (4) the distress was severe. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn.1983). Plaintiff bears a heavy burden of proof in establishing a claim for

mental distress. *Id.* at 439. To be "extreme and outrageous" defendant's conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Haagenson v. National Farmers Union Property and Casualty Co.*, 277 N.W.2d 648, 652 n. 3 (Minn.1979) (citing Restatement (Second) of Torts § 46 cmt. d (1965)). In this case, plaintiff's evidence fails to establish that the UTU's actions, even when considered cumulatively, constitute extreme and outrageous conduct "utterly intolerable in a civilized society." *Id.*

### CONCLUSION

The situation presented here is an unfortunate one as it is evident that plaintiff fell through the cracks of both union agreements. The Court is sympathetic to plaintiff's circumstances and applauds his efforts to pursue his claim this far. However, given the factual circumstances and the demanding legal standard to demonstrate a breach of the duty of fair representation, the Court grants defendant's motion for summary judgment.[8]

### ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant UTU's motion for summary judgment [Docket No. 38] is **GRANTED.**

---

7. The process involved a comparison of a train member's wage prior to and after interdivisional service was implemented on March 21, 1994. Train service members who made less money than before were certified as adversely affected. The records indicate that the majority of employees received either the same or slightly higher wage in Dilworth than

in Staples, thus accounting for the small number employees who qualified for benefits.

8. Because the Court finds that plaintiff's substantive claims fail, the Court does not address the other claims the UTU raised in its motion.

2. Plaintiff's claims against the United Transportation Union are **DISMISSED, with prejudice.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**