NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0448n.06

Case Nos. 18-2090/2149

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 23, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| LAWRENCE KOSA, et al., | ) | |
| Plaintiffs-Appellants/Cross-Appellees, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| INTERNATIONAL UNION UNITED | ) | MICHIGAN |
| AUTOMOBILE, AEROSPACE AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA and | ) | |
| INTERNATIONAL UNION UNITED | ) | |
| AUTOMOBILE, AEROSPACE AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, LOCAL 659, | ) | |
| | ) | |
| Defendants-Appellees/Cross-Appellants, | ) | |
| | ) | |
| GENERAL MOTORS, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: GUY, THAPAR, and NALBANDIAN, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** Plaintiffs are former truck drivers who believe they got a raw deal during General Motor's financial woes ten years ago. They claim GM and their labor unions misinformed them, deceived them, and breached contracts, resulting in lower compensation and premature retirements. The district court granted judgment on the

pleadings in favor of GM and granted summary judgment to the unions. The workers appeal and the unions cross-appeal. We affirm.

## I. BACKGROUND

### A. The Arrangements Between GM and ACC (1996–2009)

Until 1996, GM operated its own trucking division. It owned the assets and employed the drivers. But that year GM sold the trucking division to a new company called Automotive Component Carrier (ACC) via a purchase agreement. The GM drivers then became ACC drivers. GM still had trucking needs, however, so when GM sold the assets, it also entered into a service contract with ACC that entwined GM with ACC's new employees.

Many of the drivers had been with GM for years, and their seniority entitled them to higher, or, "first tier" wages so long as they remained working for GM. Now that they would become ACC employees, their wage rate and benefits were at risk. So as part of the service contract, GM agreed to subsidize the workers' wages at ACC. In other words, if ACC paid the workers less than what they had made at GM, then GM would cover the difference. The employees who transferred to ACC at the time of the deal came to be known as "Red Dots," although the term used in the official documents is "Transferred Employees."[1]

A few months after GM and ACC signed the two documents that animated their deal, the companies joined with the UAW[2] in signing a third document: a memorandum of understanding ("1996 Memorandum"). Among other things, the 1996 Memorandum placed two important

---

[1] The purchase agreement defined "Transferred Employee" as an hourly employee who was "actively employed by or otherwise accorded employment rights with respect to" GM's trucking division as of the closing date of the sale and who was "offered and accept[ed] employment with ACC pursuant to [] Section 4.1B" of the service agreement. The closing date was May 1, 1996.

[2] All of the parties on appeal refer to the labor organizations collectively as the UAW in the singular. We do the same here.

requirements on GM and ACC going forward. First, ACC was required to employ the Red Dots[3] and allow them to maintain their seniority status. Second, GM was obligated to hire back Red Dots under certain circumstances. This re-hiring requirement is known as the "flow-back provision."

Several months later, ACC and the UAW entered into their own agreement, the "1997 Agreement." By this time, nearly a year had passed since GM had sold its trucking division to ACC, and in the interim ACC had hired non-GM workers. But the original service contract guaranteed first-tier wages and benefits only to the workers who came from GM at the time of the sale (i.e., the Red Dots). Subsequent hires were not covered. So the 1997 Agreement brought the subsequent hires into the fold by extending the same wages and benefits to them, too. These subsequent hires came to be known as "Yellow Dots." The 1997 Agreement achieved this result by simply incorporating by reference the 1996 Memorandum.

As time went on, ACC and the UAW entered into additional agreements that modified the 1997 Agreement. These agreements established second- and third-tier wages that applied to subsequent ACC hires. As a result, the workforce at ACC became a mixture of Red and Yellow Dots—who received first-tier wages—and other employees who received lower wages.

Perhaps unsurprisingly, subsidizing the wages of employees at another company became expensive. According to a union shop chair, GM paid $26 million per year to subsidize the wages and benefits of Red and Yellow Dots working at ACC. So in 2004, GM and ACC signed a new service contract that created two avenues for reducing the subsidized workforce. First, the contract allowed eligible Red and Yellow Dots to retire and receive a lump sum payment. Second, for

---

[3] The memorandum used the term "Transferred Employees" which it defined as "hourly employees who are transferred to [ACC] as of the effective date of the sale[.]"

workers ineligible or unwilling to retire, the contract guaranteed that the workers would "be offered active employment by GM as jobs become available . . . with the goal that all offers . . . be completed within 18 months" but "in no event later than [January 31, 2009]."

In 2009, GM filed for bankruptcy and it became clear that GM would need to restructure to stay afloat. Thus GM, ACC, and the UAW negotiated and signed a new memorandum of understanding called a "special attrition plan" or "SAP." The idea was to reduce the number of ACC employees for whom GM was subsidizing wages. The attrition plan therefore gave those employees incentives to leave ACC. The plan identified four categories of employees:

> a. EBU[4] Red Status – current employees who worked for GM and who were active at the time of the sale of the MAO Transportation Business Unit (the "Business"), have contractual flow back rights to GM and are paid the EBU automotive wage and benefit package
>
> b. EBU Yellow Status – current employees who were not working for GM at the time of the sale of the Business and have no flow back rights to GM but are paid the EBU automotive wage and benefit package
>
> c. NBU[5] Status – current employees who were not working for GM at the time of the sale of the Business and are paid at a second tier of wages and benefits (lower than the automotive rate)
>
> d. PBU[6] Status – current employees who were not working for GM at the time of the sale of the Business and are paid at a third tier of wages and benefits (lower than the second tier)

The plan then went on to give EBU employees (i.e., Red Dots and Yellow Dots) three options, succinctly described by the district court:

> (1) immediate retirement with certain GM benefits and a pay-out ("the retirement option");
>
> (2) voluntary resignation with a pay-out ("the buy-out option"), or
>
> (3) retention of their current positions with a reduction to third-tier wages and benefits and a pay-out ("the buy-down option").

---

[4] "EBU" stands for "Existing Business Unit."

[5] "NBU" stands for "New Business Unit."

[6] "PBU" stands for "Progressive Business Unit."

Employees who failed to select an option were deemed to have chosen option three.

In June 2009, ACC and the UAW sent a letter to each employee explaining the special attrition plan. A copy of the plan was enclosed with the letter, along with an election form for choosing one of the three options. The letter also informed recipients of an upcoming informational meeting where they could get answers to their questions about the plan.

A few things then happened in quick succession. The informational meeting about the plan was held on Sunday, June 7. The UAW held a ratification vote the following Wednesday, June 10, at which the bargaining unit ratified the plan by a margin of 87% to 13%. The deadline for submitting the election forms came a month later on July 22.

The plaintiffs in this case all chose the retirement option, but they soon regretted it. For some, retirement came too early. If they could not keep their wage rate at ACC, they would have preferred to have gone to work at GM. But they claim that at the information meeting they were led to believe that there was no chance any of them—Red Dots or Yellow—would be able to get jobs at GM in the future. And although the letter they received stated that Yellow Dots did not have flow-back rights, they claim that was not true. By taking the retirement or buyout options, each of them forfeited the chance to get a job at GM in the future. Some of the workers claimed deceit on the part of their bargaining unit's chairperson, Rick Toldo, accusing him of rejecting better offers from GM solely for personal gain. To that end, they filed a grievance within the UAW, but it was ultimately dismissed. They then turned to the federal courts and filed this suit in 2013.

## B.   The Lawsuit (2013–2018)

The suit started out on a conventional track. Plaintiffs filed a complaint and then amended it. The UAW and GM each filed Rule 12 motions. The district court granted GM's motion but

denied the UAW's. After more than a year of discovery, the UAW filed a motion for summary judgment. The court granted the motion in part and denied it in part in October 2015. The parties attempted but failed to reach a settlement and began to prepare for trial.

Things derailed when the parties began to discuss jury instructions. Plaintiffs and the UAW realized that more discovery was needed. As the district court explained:

> Defendants identified job application records likely in the possession of a third party, General Motors, LLC, ("GM") which may be pertinent to dispositive factual questions. Plaintiffs agreed that these documents were important and explained that they have long had a subpoena pending to retrieve these same records as well. Fact discovery has already closed. However, in view of the fact that these records are of substantial importance to the remaining factual questions and may aid in the more economical resolution of outstanding disputes between the parties, the court encourages the parties to obtain these records promptly and will consider them to be supplements to the existing factual record.

The parties obtained the discovery they sought which led them each to request something. The UAW wanted leave to file another dispositive motion, while plaintiffs wanted leave to file a third amended complaint. The court allowed the UAW to file its motion and permitted plaintiffs to file a motion for leave to file a third amended complaint. Ultimately, the court did not allow plaintiffs to file a new complaint and granted the UAW's motion for summary judgment.

Plaintiffs appeal and the UAW cross-appeals. Plaintiffs believe there are genuine issues of material fact on all of their claims, thus entitling them to a trial. Plaintiffs also insist that the district court abused its discretion by declining to permit them to file another amended complaint. The UAW's challenge on appeal is narrower. It argues that the district court erred when it initially denied summary judgment to the UAW on the duty of fair representation claim.

## II.  DISCUSSION

There are three counts to the operative complaint. Count One asserts that GM and ACC violated the terms of the 1996 purchase agreement and the UAW violated Section 301 of the Labor

Management Relations Act by failing to perform its duty of fair representation. Count Two is solely against the UAW and asserts that it violated Section 9(a) of the Fair Labor Relations Act in the way it communicated and handled the special attrition plan options. Count Three is a Michigan common-law fraud claim against the UAW. Plaintiffs do not challenge the judgment against them as to Count Three, so we look only to the first two counts.

A. Count One — The Hybrid Claim

When workers are represented by a union, their disputes with the union and their employer are often resolved entirely out of court. That is because collective bargaining agreements often include binding arbitration clauses that constrict courts' authority to review the result. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 764 (1983). Ordinarily "an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163 (1983). And "[s]ubject to very limited judicial review, he will be bound by the result according to the finality provisions of the agreement." *Id.* at 164.

Even so, workers represented by a labor union may sometimes sue both their employer and the labor union that represents them. Section 301 of the Labor-Management Relations Act authorizes both types of claims, but the theories of liability are different. When employees sue an employer under § 301, they do so on the grounds that the employer has breached the collective bargaining agreement. *Id.* at 163–64. In contrast, claims against labor unions are not premised on the terms of the agreement, but rather, the labor union's implied duty to give fair representation to the employees it represents. *Id.* at 165. For this reason, a § 301 claim against both the employer and the union is sometimes called a "hybrid" claim. *Id.* Importantly, "if the first claim anchored

in the employer's alleged breach of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990).

Count One is a hybrid claim. On the employer side, plaintiffs assert that GM breached the collective bargaining agreement by "failing to honor the terms" of the 1996 purchase agreement, which they contend "were in effect in the 1997, 1999, and 2004 collective bargaining agreements." Second Am. Compl., ¶ 65. Specifically, they claim GM failed to "move one NBU group-member to EBU status upon the retirement of two EBU group members" and failed to inform plaintiffs of their flow-back rights or offer them jobs with GM. *Kosa v. Int'l Union United Auto., Aerospace & Agr. Implement Workers of Am., Local 659*, No. 13-cv-11786, 2013 WL 6631531, at *7 (E.D. Mich. Dec. 17, 2013) ("*Kosa I*"). On the union side, plaintiffs identify four ways that the UAW allegedly breached its duty of fair representation: (1) the UAW withheld information from plaintiffs during the ratification process of the SAP, (2) the UAW misrepresented to plaintiffs the flow-back agreement, (3) the UAW failed to investigate GM's and ACC's violations of the collective bargaining agreements, and (4) the UAW failed to grieve violations on behalf of plaintiffs. Second Am. Compl., ¶ 65. We begin with the claims against GM.

The district court dismissed GM as a defendant early in the litigation. The court properly observed that § 301 "confers jurisdiction to hear a suit for breach of only a contract between an *employer* and a labor organization (such as a collective bargaining contract) or between two labor organizations." *Kosa I*, 2013 WL 6631531, at *7. Thus, plaintiffs could not "premise their § 301 claim on any promise contained in" the 1996 asset purchase agreement because "the UAW was not a party to that agreement." *Id.* And after ACC purchased GM's trucking division, plaintiffs became the employees of ACC, not GM, making subsequent collective bargaining agreements

inapplicable to GM. *Id.* This meant that the only contracts to which GM and the UAW were both parties were the 1996 Memorandum and the SAP. The district court concluded that the complaint failed to state a claim based on breach of either agreement, so it dismissed GM as a defendant.

Now on appeal, plaintiffs suggest that we should hold GM to obligations in other contracts too, even though GM and the UAW did not sign them. But the only case plaintiffs provide for this proposition is *Anderson v. AT&T Corp.*, 147 F.3d 467 (6th Cir. 1998). That case dealt with employees who switched unions but remained employed by the same company. The employees sued their employer to recover benefits that their first union had negotiated for them in a contract that the employer signed. We likened the employees to "retirees or other workers who have left the original bargaining unit, but who clearly are entitled to continued receipt of previously vested benefits[.]" *Id.* at 469. That is quite different from imposing contractual obligations on an entity that never agreed to them. GM agreed to the terms of the 1996 Memorandum and it remains bound to honor those terms. But it did not become a party to subsequent contracts between different parties simply because those parties incorporated the memorandum's terms. The district court properly constrained its review to the 1996 Memorandum and SAP.

1.     The 1996 Memorandum

By its terms, the 1996 Memorandum's flow-back provision was neither automatic nor open-ended. The provision read as follows:

> Any Transferred Employee, who makes written application to GM on or before September 14, 1997, will be eligible for future employment at GM plants on the same basis as laid-off GM-UAW employees pursuant to the provisions of Appendix "A", of the GM-UAW National Agreement. Applicants will be offered opportunities for meaningful employment within General Motors in a manner that protects the effectiveness of the on-going operations for [ACC] and GM in accordance with the discussions between the parties, as openings occur.

The memorandum defined "Transferred Employees" as "hourly employees who are transferred to [ACC] as of the effective date of the sale," which was May 1, 1996. Appendix A's provisions laid out the rules of seniority and ensured that applicants could designate the plant or plants they would be willing to flow back to. Thus, standing alone, the 1996 Memorandum placed clear limits on who was eligible to flow back to GM: only hourly employees who transferred from GM at the time of the sale and applied by the September 1997 deadline. But as the district court pointed out, things were more flexible than that. GM's General Director of Labor Relations admitted in his deposition that if an employee had not applied by the initial deadline, he or she could still apply later, though an application was still required.

This prolonged period for applications did not, however, make Yellow Dots eligible for flow back under the 1996 Memorandum. The memorandum unambiguously limited flow-back rights to employees who transferred at the time of the sale, i.e., Red Dots. The district court rightly observed that the SAP separately required GM "to give Yellow Dots 'an opportunity to make application to be considered for employment at GM' and to consider eligible Yellow Dots for rehire 'based upon their current seniority date from an integrated list of eligible employees from other agreements.'" But the 1996 Memorandum did not obligate GM to offer jobs to Yellow Dots. The district court therefore properly dismissed the Yellow Dots' claims against GM on the basis of the 1996 Memorandum.

That leaves only the Red Dots. GM's motion for judgment on the pleadings pointed out that the complaint did not reference any specific contractual language from the 1996 Memorandum that GM allegedly violated, nor did it "allege GM denied flow back rights to Plaintiffs who requested return to GM employment." Plaintiffs' response brief did nothing to counter those claims and apparently at the hearing on the motion, plaintiffs clarified that GM allegedly breached

contracts in only two ways: "(1) by failing to move one NBU group-member to EBU status upon the retirement of two EBU group members; and (2) by not informing Plaintiffs of their flow-back rights or offering them jobs with GM when ACC's viability was threatened." *Kosa I*, 2013 WL 6631531, at *7. Neither of these implicates a contractual obligation in the 1996 Memorandum, so the district court properly dismissed the Red Dots' claims against GM on the basis of that memorandum.

The district court also properly declined to revisit the dismissal. More than four years after the court dismissed GM from the suit, plaintiffs sought leave to file an amended complaint that would bring it back in. In the interim, plaintiffs had obtained hiring records from GM and used them to add more detail to the complaint. But as the district court explained:

> To succeed on this claim Plaintiffs would need to either (1) identify an employee who was hired prior to the 2009 SAP elections and possessed less seniority under Appendix A of the CBA than a Red Dot who filed an application on time; or (2) identify an employee who possessed less seniority under Appendix A of the CBA than a Red Dot and was hired following the 2009 SAP elections in place of a Red Dot who had not forfeited his flow-back status through selecting the retirement option under the 2009 SAP. Plaintiffs have done neither.

We agree with the district court on both scores. Plaintiffs needed to plead how GM breached actual contractual terms of the 1996 Memorandum, and the proposed amended complaint failed to do so.

## 2. The SAP

Plaintiffs' assertion that GM breached the SAP came closer to adequately stating a claim, but still fell short. Unlike the 1996 Memorandum, the SAP did include language about communicating with the employees. Its first paragraph read:

> Automotive Component Carrier LLC ("ACC"), General Motors Corporation ("GM") and the International Union UAW ("UAW") will jointly develop a communication plan designed to explain to employees of ACC available options

agreed to in this Memorandum. This Special Attrition Plan will be presented to all UAW represented employees of ACC no later than May 28, 2009.

Notably, this general provision did not provide much detail on what the communication plan had to include. Nor did it define who was required to carry out the plan after ACC, GM, and the UAW jointly developed it. It simply required the three of them to devise a plan together. And evidently, they did, hence the June 2009 letter about the SAP and information meeting held that month. Plaintiffs think that on balance, the information they received was inadequate, even misleading. Perhaps it was. But their claim against GM must rest on the breach of a contract, and the complaint did not identify how GM's alleged failure to advise plaintiffs of their flow-back rights breached the terms of the SAP.

We then turn to plaintiffs' failure-to-hire theory of liability and clarify the relevant record. GM moved under Rule 12(c) and attached to its motion three documents: the 1996 purchase agreement, the 1996 Memorandum, and the SAP. Plaintiffs' response brief added the 1996 service contract and portions of the 1997 Agreement. These documents were all referred to in the complaint and integral to plaintiffs' claims, so the district court considered the motion and the documents under the 12(b)(6) standard. *Kosa I*, 2013 WL 6631531, at *1. Our own de novo review applies the same standard and is constrained to the evidence presented to the district court at the time of its decision. *See Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007); *Weiner v. Klais & Co.*, 108 F.3d 86, 88–89 (6th Cir. 1997). Consequently, the hiring records, testimony, and admissions that appeared later are of no moment.

The only relevant portion in the SAP that bound GM's hiring actions was paragraph 6, which read:

> All EBU Yellow Status Employees will be given an opportunity to make application to be considered for employment at GM based upon their longest unbroken seniority at ACC. Eligible employees will be considered after all GM

> collectively bargained contractual obligations have been satisfied. Eligible
> employees will be considered for employment with GM based upon their current
> seniority date from an integrated list of eligible employees from other agreements.
> Specific guidelines will be made available within 30 days following the signing of
> the agreement.

This paragraph imposed obligations on GM to consider Yellow Dots for employment, but only within the machinery of other agreements and seniority lists. It is therefore not enough to allege that GM failed to offer jobs to Yellow Dots. To avoid GM's dismissal from the suit, at least one plaintiff had to allege that (1) GM had a job opening, (2) GM's other "collectively bargained contractual obligations" were satisfied, and (3) GM offered the job to someone with less seniority than the plaintiff and in contravention of the specific guidelines that were made available after the SAP was signed.

The complaint did not contain such an accusation. Only three paragraphs come close. Paragraph 32 asserted:

> A few ACC employees were offered the opportunity to flow back into GM, and
> several more were offered employment at GM two or more years after the 2009
> SAP, but some of those who were eventually offered jobs had those job offers
> rescinded, and others were eventually offered jobs at lower wages and reduced
> benefits and after GM had hired people "off the street" for employment. Most
> plaintiffs were never offered employment at GM.

Paragraph 52 stated that "[s]ome plaintiffs who were eligible to retire were told that if they didn't retire, they would simply be terminated, when in fact several other employees who did not retire eventually flowed into GM with top-tier pay and full benefits." And paragraph 59 claimed:

> Defendant GM breached its collective bargaining agreement with its employees,
> including plaintiffs, in the ways enumerated above, including failing to provide
> plaintiffs with their flow-back rights, failing to work with the Local and
> International unions and ACC to explain to plaintiffs the available options, and
> failing to actually notify plaintiffs of those available options.

We must assume the truth of all those factual assertions. *See Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998). Yet even assuming their truth, none of the claims in these paragraphs

establishes that GM breached any terms of the SAP. Given the conditions set forth in paragraph 6 of the SAP, GM could fail to hire any number of Yellow Dots without necessarily breaching the contract. And if anything, paragraph 52 of the complaint reveals that GM *did* honor its contractual obligations because it allowed employees who chose not to retire to "flow[] into GM with top-tier pay and full benefits." The district court properly granted GM's motion for judgment on the pleadings.

The district court also properly denied the subsequent motion to amend the complaint. Paragraphs 38 and 39 of the proposed amended complaint would have added some specificity about GM's alleged hiring practices in 2009 and 2010. But even these new details would not remedy the complaint, for they merely allege that GM hired many workers into positions that plaintiffs would have been eligible for had they not retired or taken the buy-out. But plaintiffs did do those things. Whether the UAW misled them in making those choices is a question we address below. The answer to that question, however, has no impact on whether GM breached the terms of the SAP. Amending the complaint as proposed by plaintiffs would have been futile, so the district court properly denied the motion to do so.

We conclude that the district court properly granted judgment in favor of GM on Count One. And when one half of a hybrid claim fails, the other must too. *See White*, 899 F.2d at 559. We therefore affirm the district court's grant of judgment in favor of both GM and the UAW on Count One.

B.      Count Two — Fair Representation Under the NLRA

Count Two is premised on § 159 of the National Labor Relations Act, which establishes that the representative of a bargaining unit is "the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of

employment, or other conditions of employment." 29 U.S.C. § 159(a). This "grant of exclusive representation status to a union over employees . . . creates a duty of fair representation on the representative union." *Pratt v. United Auto., Aerospace & Agr. Implement Workers of Am., Local 1435*, 939 F.2d 385, 388 (6th Cir. 1991) (citing *Humphrey v. Moore*, 375 U.S. 335, 342 (1964)). "This duty does not depend on the existence of a collective bargaining agreement," but rather, "it flows from the union's statutory position as exclusive representative and exists both before and after the execution of an agreement." *Id.* (quotation marks and citation omitted). To prevail on such a claim, a plaintiff needs to show that the union's "conduct toward a member of the collective bargaining unit [was] arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).

Plaintiffs' accusations against the UAW can be reduced to three points in time: before, during, and after the SAP. Before the SAP, the UAW allegedly turned down buy-out offers proposed by GM in 2008 without ever mentioning them to plaintiffs. Once the SAP had been proposed, and while plaintiffs were considering whether to ratify it, the UAW allegedly told them, falsely, that (1) they had no flow-back rights, (2) that they would never see the inside of a GM plant, and (3) that ACC would close if they did not ratify the SAP. Finally, after the SAP was ratified and plaintiffs were told to make their elections, the UAW allegedly misrepresented the terms of the SAP and later precluded plaintiffs from rescinding their elections. *See* Second Am. Compl. ¶ 19–21, 24–25, 68.

The UAW countered each of these claims in its motion for summary judgment and the court largely agreed with the UAW.[7] At the outset, the court rejected the claim about post-election

---

[7] We note that the UAW initially filed a 12(b)(6) motion in lieu of an answer and argued that plaintiffs had failed to exhaust the UAW's internal remedies, thereby barring their ability to bring the § 159 claim to court. The district court considered several UAW adjudicatory records and concluded that plaintiffs did file a grievance but did not comply with the UAW's procedures. At that time, however, the court declined to decide whether the failure to exhaust should

rescission because it was unsupported by any evidence. *Kosa v. Int'l Union United Auto.*, 143 F. Supp. 3d 592, 603 n.4 (E.D. Mich. 2015) ("*Kosa II*"). It then turned to the undisclosed offers and conceded that, in hindsight, workers may have lost more lucrative proposals by turning down the alleged earlier offers. *Id.* at 604. But the decisions could not be judged retrospectively and the court concluded there was "no evidence suggesting that [the UAW's bargaining] strategies were 'irrational' or employed in 'bad faith.'" *Id.*

Finally, the court turned to how the UAW advised plaintiffs about the SAP itself. The court concluded that only Red Dots who had not retired before 2009 could validly claim they were harmfully misadvised about their flow-back rights; Yellow Dots did not have those rights and Red Dots who had already retired could not have been harmed by the alleged misinformation. *Id.* at 605. "If the factfinder believes that a UAW official told the thirty-four remaining Red Dot Plaintiffs that they did not have the right to pursue the possibility of flowing back to GM, it could reasonably conclude that UAW acted arbitrarily in breach of its duty of fair representation." *Id.* at 606. As for union officials allegedly telling plaintiffs they would never see the inside of a GM plant, the district court concluded that this was not an unreasonable projection, given the precarious state GM and ACC were in. *Id.* at 607. Even so, the district court pointed out that "mere negligence or poor judgment on the part of the union will not support a claim of unfair representation." *Id.* (quoting *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994)). So the court granted summary judgment in favor of the UAW on all but the remaining Red Dots' claim that they were misadvised about exercising their flow-back rights. *Id.* at 608.

---

be excused and instead permitted the case to tentatively go forward. The UAW did not revisit the matter when it moved for summary judgment, nor does it now challenge the failure to exhaust on appeal.

Now on appeal, plaintiffs argue the court was wrong about the Yellow Dots and the retired Red Dots because, as they state in their brief, "there are questions of fact at every turn." But the brief fails to identify any questions of fact that would undermine the district court's decision. And even so, our review is constrained to the factual recitations presented to the district court. *See Chicago Title Ins. Corp.*, 487 F.3d at 995. We find no error in the district court's decision.

1. The alleged pre-SAP offers

Plaintiffs provided testimonial evidence that GM offered the UAW perhaps as many as 17 offers prior to the offer that led to the SAP. In particular, there is testimonial evidence that one such offer was a $140,000 buyout. And plaintiffs seemed to suggest in a response brief (though not through testimony) that they would have taken the $140,000 buy-out if offered it. But this evidence is not enough to prove that the UAW's rejection of prior offers was "so far outside a wide range of reasonableness" that it was irrational. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (quotation marks and citation omitted). After all, we review the UAW's actions "in light of the factual and legal landscape at the time." *Id.* As the district court pointed out, "at the time UAW allegedly 'turned down' the favorable $140,000 buy-out offers, UAW did not know that GM's future financial circumstances would prevent it from offering better options later." *Kosa II*, 143 F. Supp. 3d at 604–05. Moreover, the $140,000 offer—if it was indeed a true offer— apparently would have meant instant retirement and no future benefits. The UAW could have reasonably determined that such a trade-off was not the best they could do for the workers they represented, particularly those who were not close to retiring. *See Bowerman v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 646 F.3d 360, 369 (6th Cir. 2011) (recognizing that "unions are rarely able to negotiate agreements that completely satisfy the desires of all its represented members"). In any event, arbitrariness is our watchword, which is

why it is not enough even to show that a union's judgment was ultimately wrong, negligent, or mistaken. *Id.* at 368. The district court properly concluded that plaintiffs failed to provide evidence that the UAW rejected offers arbitrarily, discriminatorily, or in bad faith.

### 2. The ratification and election process

Claims under § 159 require that the union's actions resulted in actual harm. *See Matthews v. Milwaukee Area Local Postal Workers Union*, 495 F.3d 438, 441 (7th Cir. 2007). Plaintiffs' alleged injury is that they gave up the opportunity to flow back to GM. We have already explained why Yellow Dots did not have flow-back rights, so they gave nothing up, regardless of any misinformation they received from the UAW. The same reasoning applies to the Red Dots who retired before 2009. By retiring, they became ineligible for flow back to GM. Summary judgment against those Red Dots and all Yellow Dots was therefore proper.

The only plaintiffs left are Red Dots who did not retire before the SAP and, initially, the district court denied summary judgment against them. *See Kosa II*, 143 F. Supp. 3d at 608. But years later, the district court granted summary judgment in favor of the UAW on this final group of claims, too. By then, subsequent discovery had revealed that many of the Red Dots failed to submit the application necessary to qualify for flow back. Those who did apply selected options in their applications that took them out of the running for certain jobs. Consequently, the district court concluded that the remaining Red Dots failed to provide evidence that they would have received jobs at GM if the UAW had better advised them about flow back.

Plaintiffs now insist that was error, but we disagree. To understand why, we pause to clarify the Red Dots' claim. Each of the Red Dots selected the retirement option instead of the buy-down. Each Red Dot now claims he would have been better off selecting the buy-down option—even though it amounted to a fifty-percent pay cut and reduction in benefits—because a

Red Dot who remained working at ACC could still flow back to GM and be restored to his higher wages and benefits. The Red Dots' prospective damages are therefore the difference between what they actually received through the retirement option and what they would have received if they eventually flowed back to GM.

The problem for the Red Dots, however, is that the burden of proof they face is very heavy. They must show that they would have flowed back to GM *but for* the UAW's failure to advise them on their flow-back rights and on the application process. *See Wood v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local 406*, 807 F.2d 493, 502 (6th Cir. 1986). But even if the UAW did everything plaintiffs wish it had done, there is no guarantee that any of the plaintiffs would have flowed back.

Flowing back to GM after the SAP required several things to fall into place. First, the worker needed to fill out an application. Second, the application needed to designate the plant or plants the worker was willing to flow back to. Third, the worker had to choose the buy-down option in the SAP election form (or leave it blank, since buy-down was the default). Fourth, an opening needed to occur at one of the plants the worker designated. Fifth, the worker needed to have higher priority and seniority than other candidates for the job. And sixth, the worker needed to accept the position. Even assuming the UAW explicitly told the Red Dots that they had to fill out an application, helped them do it, and then told them they had to choose the buy-down option to retain flow-back rights, there would still remain three links to the chain requiring proof.

A case from the Eighth Circuit reveals why those last three links are necessary. In *Anderson v. United Paperworkers*, employees of an auto-parts maker bargained for a severance-pay provision. 641 F.2d 574, 575–76 (8th Cir. 1981). Although the collective bargaining agreement did not establish a security fund to protect the severance pay if the company went

bankrupt, the union representative knowingly lied to the employees and told them a fund did exist. *Id.* at 576. When the company did go bankrupt, the employees were shortchanged and sued the union for breaching its duty of fair representation. At trial, the employees testified that availability of the severance pay was a major concern of theirs and "[s]everal employees testified that they would have gone out on strike or found other jobs had they known the truth[.]" *Id.* at 579.

The jury found for the employees, but the court of appeals ruled that the union was entitled to judgment notwithstanding the verdict. It explained:

> Even assuming that but for [the union representative's] misrepresentations the employees would have struck in 1974 to obtain a security fund, there is no proof that they would have accomplished their objective. The plaintiffs have not proved that but for [the union representative's] misrepresentations in 1974 they would have obtained their severance pay. . . . The plaintiffs assert that during the [earlier] collective bargaining sessions . . . the employees might have been able to obtain a severance pay security fund from the company had they known the truth about the lack of such a fund. Again, such a conclusion is merely conjectural. Even if, in these earlier years, the company was financially better able to provide a fund it is purely speculative whether it would have been more willing to do so or whether a strike could have forced the company to provide a fund.

*Id.* at 580. The court pointed out that holding the union liable "absent a showing that but for [the] misrepresentations the severance pay would have been paid" would be inconsistent "with the Supreme Court's mandate that a union be held accountable only for that portion of the employee's damages attributable to the union's breach of the duty of fair representation." *Id.* (relying on *Vaca*).

So too here. The Red Dots' claimed injury was the loss of employment, pay, seniority, and benefits, along with the attendant emotional distress. Second Am. Compl. ¶ 69. A Red Dot only "lost" these things if a position at GM later opened up for which he would have been the preferred candidate. Thus, each plaintiff needed to identify a job that went to someone else at a plant the

plaintiff designated in a flow-back application or would have designated in an application had he known he needed to fill one out. No plaintiff provided this information.

What plaintiffs did provide was unspecific. For instance, they pointed to a spreadsheet documenting the many Delphi employees whom GM hired between 2009 and 2010. But as the district court observed, under Appendix A a Delphi employee could sometimes have precedence over a Red Dot, depending on seniority and whether it was an area hire or an extended area hire. The details were therefore critical.

The other evidence was the stack of affidavits which plaintiffs submitted in their opposition to summary judgment. In each, the affiant Red Dot declared that he would have gone to work at any GM plant "within a 50-mile radius of my home." The affidavits, however, were all executed after the UAW filed its motion for summary judgment pointing out the causal gap in plaintiffs' case, long after discovery had closed. And notably, the widespread willingness to work at more distant plants never came up in the depositions that were taken during the discovery period and made part of the record. Consequently, despite a thorough review of the evidence at several stages in the case, the district court determined that plaintiffs had provided only a "scintilla of evidence"—not enough to avoid summary judgment.

We agree with the district court. We have previously recognized that last-minute, form affidavits can fail to establish a genuine issue of material fact. *See Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984); *see also Gardner v. Evans*, 920 F.3d 1038, 1055 (6th Cir. 2019). And even without discounting that evidence, plaintiffs failed to draw the necessary connections between themselves and the jobs they purportedly missed out on. Without that evidence, plaintiffs failed to establish that the UAW's alleged misdeeds caused their injuries. Such a showing was required. *See Deboles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1019 (3d Cir. 1977)

(recognizing that in the absence of an injury "any remedy against the union would necessarily be a 'punishment' for a harmless lie"). The district court therefore properly granted summary judgment on Count Two in favor of the UAW.

## III.    CONCLUSION

There is no question that 2009 was a difficult time for GM workers. The company's impending bankruptcy created sprawling uncertainties for both its workers and the union that the workers chose to represent them. In hindsight, some of those workers feel their union leadership fell short. But after years of litigation and many thorough opinions, the district court concluded that those workers failed to marshal enough evidence to prevail in their chosen causes of action. We find no error in the district court's decision and thus its judgment is AFFIRMED and the UAW's cross-appeal is DISMISSED.